[Civ. No. 7246.    Third Dist.    Aug. 17, 1946.]

AMERICAN ALLIANCE INSURANCE COMPANY (a Corporation), Appellant, v. THE CAPITAL NATIONAL BANK OF SACRAMENTO (a National Banking Association), Respondent.

Elliott, Atkinson & Sitton for Appellant.

Treadwell & Laughlin for Respondent.

THOMPSON, J.—The plaintiff has appealed from a summary judgment which was rendered against it under section 437c of the Code of Civil Procedure, in a suit against The Capital National Bank of Sacramento, for damages sustained as a result of having paid several fraudulent drafts presented by an agent and employee of plaintiff, upon which the agent

had forged the names of the payees and appropriated the proceeds to his own use. The names of the payees were certified by the agent of plaintiff as genuine. The plaintiff was insured against the dishonest conduct of its agent by a surety company, which is not a party to this action. Upon demand the surety company paid plaintiff the amount of its losses before the commencement of this suit. Plaintiff then brought suit against the bank for wrongfully paying the forged drafts. After the pleadings were filed the defendant moved for a summary judgment thereon, which was granted.

The complaint is couched in 23 counts, based on separate insurance claims for losses sustained in the aggregate sum of $19,889.20, alleged to have been wrongfully paid by the defendant bank to one Ernest C. Dietz, upon bills of exchange drawn against plaintiff by E. D. Petrie and other named insurance adjusters in favor of various named payees; that said claims were sent by plaintiff to the said Dietz at Sacramento for delivery to the payees for their approval; that said claims were not delivered to, nor signed by any of the payees, but their names were forged thereon by the said Dietz and the instruments were then delivered to the defendant bank and endorsed by it, thereby guaranteeing all prior endorsements, including the forged names of the payees, and then forwarded by the bank to Clifford Conly, the managing agent of plaintiff, or to plaintiff itself and accepted in reliance on the guarantee of signatures, whereupon the bank paid them to Dietz without previous knowledge of said forgeries; that the bank wrongfully paid said claims to Dietz who misappropriated the proceeds thereof; that plaintiff did not learn of said forgeries or misappropriations until June, 1942, and that upon demand the defendant refused to repay any portion of said money, and still wrongfully retains the same.

The answer denies the essential allegations of the complaint and pleads laches and the statute of limitations, asserting that plaintiff had information which furnished or imputed knowledge of the forgeries and misappropriations of money by Dietz "long before the commencement of this action." The answer affirmatively alleges that the bills of exchange were entrusted to Dietz as the agent and employee of plaintiff; that plaintiff was fully insured and protected "against any dishonesty, misappropriation or wrongdoing of its em-

ployees, including the said Dietz," by a policy issued by The Fidelity and Casualty Company of New York, which company had fully indemnified and paid plaintiff all of said losses mentioned in the complaint; that plaintiff, before the commencement of this action, assigned said claims to the casualty company which is not a party to this action, and that plaintiff is not a proper party plaintiff.

The defendant moved for summary judgment under section 437c of the Code of Civil Procedure, based on affidavits of Messrs. Holmes, an officer of the defendant bank, and Treadwell, together with the records and files in this case. The affidavit of Mr. Holmes averred that the bank paid the drafts to Ernest C. Dietz in the regular course of banking business, without knowledge of the forged signatures of the payees and in reliance upon the endorsement of plaintiff's agent in the following language, "O. K. Signature at bank. Ernest C. Dietz, Special Agent"; and that Dietz had full authority of plaintiff to present the drafts to the bank and to receive payments thereof.

The affidavit of Mr. Treadwell averred that Ernest C. Dietz acted as the agent and employee of plaintiff in all his transactions mentioned in the complaint, and was authorized by plaintiff to present the claims and to collect the drafts; that plaintiff was insured against the dishonesty and misappropriations of its agents, including those of Mr. Dietz, by a policy issued by The Fidelity and Casualty Company of New York, which casualty company "paid to the plaintiff the full amount of said instruments set forth in the complaint, and that plaintiff had been fully indemnified for all losses suffered"; that, before the commencement of this action, plaintiff assigned its choses in action to said casualty company, as shown by the photostatic copies of instruments which are contained in the transcript, and which were made a part of said affidavit.

To said motion for summary judgment, Wm. A. Sitton filed a counteraffidavit in behalf of plaintiff, in which he averred that the drafts were paid by the defendant bank without the endorsement of Dietz, and merely upon his "O. K." of the signatures of said payees, to each of which drafts Mr. Holmes added his personal "O. K." before it was presented to the teller and paid without previously inquiring as to the genuineness of the signature of the payee. Mr. Sitton

further averred that, upon inspection of the records he ascertained that "there was no 'Assignment' from plaintiff to The Fidelity & Casualty Company of New York of any rights of plaintiff, nor any other agreement other than the 'loan receipt' " attached to the affidavit of Mr. Treadwell. From that exhibit it appears that on October 5, 1942, the plaintiff did receive from the casualty company the aggregate sum of $19,889.20, for which sum plaintiff then receipted in writing. There is no other evidence of either an assignment of the choses in action, or of payment of the losses sustained by plaintiff.

The receipt in question reads in part:

"New York, N.Y., October 5, 1942

"Received from The Fidelity and Casualty Company of New York, (Hereinafter called the 'Company'), Nineteen Thousand Eight Hundred Eighty Nine and 20/100 Dollars ($19,889.20), as a loan, without interest, repayable only in the event and to the extent of any net recovery the undersigned may make from any person, persons, corporation or corporations, or other parties, causing or liable for the loss sustained by the undersigned through the acceptance and payment of the following described drafts: . . . [Here follows the dates, numbers, names of payees and amounts of the several fraudulent claims in the aggregate sum of $19,889.20]

"The undersigned hereby agrees to promptly present claims and, if necessary, to commence, enter into and prosecute suit against such person or persons, corporation or corporations, or other parties, through whose negligence or other fault, the aforesaid loss was caused, with all due diligence at the expense and under the exclusive direction and control of the Company. . . ."

Upon the foregoing evidence the trial court granted the motion and rendered judgment that plaintiff take nothing by its action. From that judgment the plaintiff has appealed.

The respondent contends that the receipt previously mentioned is a mere subterfuge on the part of the surety company, and that, properly construed in the light of the weight of authorities, it shows that plaintiff was fully compensated for its losses before the commencement of this suit and therefore has no valid cause of action against the bank, and that the surety company was not entitled to be subrogated to

plaintiff's rights against the bank upon payment of its losses and therefore has no right of action against the bank which it could have assigned to plaintiff or maintained in its own name.

The appellant contends that the surety company did not pay plaintiff its losses in satisfaction of its surety liability, but, on the contrary, that it merely *loaned* plaintiff the money which it paid, as the receipt therefor clearly indicates, and that said receipt authorized plaintiff to, and it did, institute this action in behalf of the surety company.

We are of the opinion that, since the plaintiff was fully compensated for its loss on account of the forgeries of the drafts and the misappropriations of funds by Dietz before the commencement of the action, it could not maintain this suit in its own behalf, for to do so would result in plaintiff's receiving double pay for its losses, and that it could not maintain the action in behalf of the surety company, the indemnitor of plaintiff, since it was not entitled to be subrogated to the rights of plaintiff. (*Meyers* v. *Bank of America etc. Assn.*, 11 Cal.2d 92 [77 P.2d 1084].)

We are of the opinion the trial court properly granted the motion for summary judgment under the circumstances of this case.

The case of *Meyers* v. *Bank of America, supra,* appears to be determinative of the issue in this case against this appellant. It holds that if The Fidelity and Surety Company paid plaintiff the full amount of the losses sustained on account of the forged drafts in satisfaction of its liability on that account, while, in accordance with the recent decision of *Anheuser-Busch, Inc.* v. *Starley,* 28 Cal.2d 347 [170 P.2d 448], a separate suit might be maintained against Dietz, the principal tort feasor, neither the plaintiff nor the surety company may maintain an action against the bank on the theory of subrogation or otherwise.

In the Meyers case numerous bank checks were received at plaintiff's office payable to him. He employed a managing agent who forged the name of the payee and negotiated the checks with one of the defendants, Wascher, who paid them and deposited them to his account in a bank. The managing agent fraudulently converted the funds to his own use. The bank presented the checks to the drawees and received full payment. The plaintiff was insured with the United States

Guarantee Company against dishonest conduct of his manager and agents. Upon demand, the surety company reimbursed plaintiff for his loss, whereupon plaintiff assigned to the surety company his cause of action against the bank. Acting in behalf of the assignee, surety company, plaintiff brought suit against the bank. Judgment was rendered for plaintiff. On appeal, that judgment was reversed. The court held that:

"The right to maintain an action of this kind and to a recovery thereunder involves a consideration of, and must necessarily depend upon the respective equities of the parties. Here, the indemnitor has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the indemnitor nor the bank was the wrongdoer, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss. Under the facts of this case, as stated in *Northern Trust Co.* v. *Consolidated Elevator Co.,* 142 Minn. 132 [171 N.W. 265, 4 A.L.R. 510] : 'The right to recover from a *third person* does not stand on the same footing as the right to recover from the *principal.*' (Italics added. )

"Our conclusion, as hereinbefore has appeared, is that since the bonding company had no superior equities, it was not entitled to be subrogated to any claim plaintiff might have had against the bank."

The court also quoted with approval, at page 101, from *Estate of Whitney,* 124 Cal.App. 109, at page 117 [11 P.2d 1107], with respect to the application of the doctrine of subrogation, as follows:

" 'While section 2848 of the Civil Code provides that a surety, upon satisfying the obligation of his principal, is entitled to be subrogated to that extent to all remedies which the creditor has against the principal, the question whether the obligation which is satisfied is in fact the obligation of the particular principal is to be decided in accordance with the rules of law and principles of equity. As was said in *Southern Surety Co.* v. *Tessum,* 178 Minn. 495 [228 N.W. 326, 66 A.L.R 1136]: ''Subrogation is equity's second method of compelling the ultimate payment by one who in justice and good conscience *ought* to make it—of putting the charge where it justly belongs. (*Emmert* v. *Thompson,* 49 Minn. 386 [52 N.W. 31, 32 Am.St.Rep. 566].) It is not an absolute right, but depends upon the superiority of the equities of him who asserts it over those of the one against whom it is sought. It will never be enforced when the equities are equal or the rights not clear.'' ' ''

The decision in the Meyers case further quotes with approval from *First & Tri State Nat. Bank & Trust Co.* v. *Massachusetts Bonding & Ins. Co.,* 102 Ind.App. 361 [200 N.E. 449], as follows:

" 'The doctrine of (subrogation) has been applied most frequently in the courts to certain types of insurance cases. It has with almost unanimity been held not to apply *in favor of a surety on a fidelity bond,* except only against persons who participated in the wrongful act of the wrongdoer.' [Citing numerous authorities.] ''

The Meyers case also determines that unless the record discloses facts which would entitle one to subrogation, ''an assignment will not confer upon him the right to be substituted in an action at law upon the assignment.'' The court said in that regard at page 96:

''. . . The conclusion seems inevitable that one who asserts a right of subrogation, whether by virtue of an assignment or otherwise, must first show a *right in equity* to be entitled to such subrogation, or substitution, and that where such right is clearly shown by the application of equitable principles, *an assignment adds nothing to his right thereto.* Otherwise stated, *where* by the application of equitable principles, *a surety has been found not to be entitled to subrogation, an assignment will not confer upon him the right to be so substituted in an action at law* upon the assignment.'' (Italics added.)

On the authority of the Meyers case we conclude that The Fidelity and Casualty Company of New York, under the circumstances of this case, was not entitled to be subrogated to the rights of plaintiff in the present suit against the bank.

The case of *Anheuser-Busch, Inc.* v. *Starley, supra,* is clearly distinguishable upon the facts involved from the present suit. In that case the plaintiff shipped a cargo of yeast with Denver-Chicago Trucking Company, a common carrier. The carrier was insured against loss of goods occurring in transit. The yeast was destroyed in transit as a result of a collision on the highway between the carrier's truck and Starley's automobile. Before the commencement of the action the carrier paid Anheuser-Busch, Inc., the amount of its loss, without reference to the alleged tortious act of Starley. No release was given to the carrier upon that payment. Anheuser-Busch, Inc., then commenced suit against Starley, the alleged tort feasor, for damages for loss of said yeast on account of the collision alleged to have resulted from negligent operation of his automobile. On motion of the defendant, the trial court directed a verdict against plaintiff on the ground that it had been fully compensated for the loss by the carrier and that it was not a proper party in that action. The Supreme Court reversed the judgment, holding that plaintiff was a proper party in a suit for damages *against the principal tort feasor* in spite of payment of its loss from a source wholly independent of the wrongdoer. Numerous authorities are cited in support of that declaration of law. The court said in that regard:

"Where a person suffers personal injury or property damage by reason of the wrongful act of another, an action *against the wrongdoer* for the damages suffered is not precluded nor is the amount of damages reduced by the receipt by him of payment for his loss from a source wholly independent of the wrongdoer." (Italics added.)

The Anheuser-Busch case is distinguishable from the present action since this case is not against the tort feasor but is based on a different liability of the bank for approving and paying forged drafts without previous knowledge of the forgeries.

The principal wrongdoer in this case was the forger, Ernest C. Dietz. He was the agent and employee of plaintiff, who, by implication at least, vouched for his honesty to the bank. Dietz is not a party to this suit. The liability of the

surety company, which paid plaintiff the losses sustained, was contractual and absolute, independent of the separate liability of the wrongdoer Dietz for his forgeries and misappropriations. (*Meyers* v. *Bank of America, supra.*) The bank was not a party to the fraudulent transactions of Dietz, but it was an innocent third party who paid the drafts in reliance upon the certificate of plaintiff's agent that the signatures of the payees were genuine. The bank paid the drafts to Dietz in the regular course of banking business without knowledge of the forgeries. The equities of the transactions are all favorable to the bank. Neither the surety company nor the bank was a party to the forgeries. But the bank was misled by the certificate of the genuineness of the payees' signatures by plaintiff's agent and employee.

This brings us to a determination of whether the receipt by plaintiff of the sum of $19,889.20 from The Fidelity and Casualty Company constituted payment of the liability of the surety company and therefore a discharge of its indebtedness under the bond, or whether it was a mere loan of money to plaintiff. The only evidence to support the theory that it was a loan is the language contained in the previously quoted portion of the written receipt which plaintiff signed. It does recite that plaintiff received the money ''as a loan, without interest, repayable only in the event and to the extent of any net recovery the undersigned may make from any person, persons, corporation or corporations, or other parties, causing or liable for the loss sustained by the undersigned through the acceptance and payment of the following described drafts.'' It further provides that plaintiff will promptly commence and prosecute an action against such person or persons, corporation or corporations causing the losses ''at the expense and under the exclusive direction and control of the [surety] Company.'' The respondent contends that the language, in spite of the fact that the receipt designates the transaction ''as a loan,'' indicates the money was received by plaintiff from the surety company in payment of its bonded liability for the forgeries and misappropriations of plaintiff's agent, Dietz; that the receipt clearly infers that no money is to be returned to the surety company except to the extent that plaintiff may recover from others; that the balance of said money is to be deemed to be in payment of the surety company's liability in discharge of its indebtedness upon the bond, and that such suit against the persons caus-

ing the losses is to be maintained in behalf of the surety company "at the expense and under the exclusive direction and control of the [surety] Company."

We are of the opinion the receipt of said money by plaintiff was in payment of the surety company's bonded liability in discharge of its indebtedness, and not as a mere loan. If it was not a payment of the liability the surety company would not be entitled to subrogation and it therefore had no cause of action which could be assigned to plaintiff for collection, as we have previously held. Moreover, as the respondent asserts, the surety company which was organized under the statutes of New York was not authorized to make such an unsecured loan without interest. (*Simpson* v. *Hartranft*, 157 Misc. 387 [283 N.Y.S. 754]; *Scarborough* v. *Bartholomew* (City Court), 22 N.Y.S.2d 635; *Scarborough* v. *Bartholomew*, 263 App.Div. 765 [30 N.Y.S.2d 971]; *Purdy* v. *McGarity*, 262 App.Div. 623 [30 N.Y.S.2d 966].) In the Scarborough case first above cited, wherein an asserted loan receipt similar to the one which is here involved was construed, the court, quoting with approval from *Simpson* v. *Hartranft, supra*, said:

"If the transaction between the Home Insurance Company and the defendants could be considered a loan, in my opinion it would be illegal and void, because such a loan is not one permitted to be made, in this state, by insurance companies within the meaning of section 16 of the Insurance Law" of the State of New York.

In several New York cases, wherein the liability of insurers was absolute, as it was in the present case, in construing language of asserted loan receipts similar to the one here involved, it was held that the receipt of losses from the insurer where there were no provisions for repayment of the moneys *except upon condition that it be recovered from other parties,* and neither interest nor security for the asserted debts were provided for, they constituted payments of the liabilities and not mere loans, in spite of recitals in the written receipts that they were intended as mere loans of money. (*Yezek* v. *Delaware L. & W. Ry. Co.*, 176 Misc. 553 [28 N.Y.S.2d 35]; *Purdy* v. *McGarity* (App.Div.) *supra; Simpson* v. *Hartranft, supra; Scarborough* v. *Bartholomew* (City Court), *supra; Scarborough* v. *Bartholomew* (App. Div.), *supra; Par-X Uniform Service Corp.* v. *Emigrant Industrial Savings Bank* (Supreme Court), 49 N.Y.S.2d 557;

*Automatic Sprinkler Corp.* v. *Robinson-Slagle Lumber Co.* (La.App.) 147 So. 542.) Construing a similar receipt for money, it was said in the Yezek case, *supra,* at pages 37 and 38, that:

"The insurer's liability to the insured is *absolute* when the loss occurs. No shipper or other third party is involved. The insured is entitled to prompt payment without resort to a loan. The transaction is held to be a payment. . . . It was 'payment without regard to its form.' The so called loan was a fiction, a subterfuge unnecessary either to protect the insurer or to secure prompt payment to the insured."

Construing a similar purported loan receipt in the Purdy case, *supra,* at page 970 [30 N.Y.S.] the court said:

"It strains our credulity too far to treat that agreement as one for a loan."

Likewise in construing a similar purported loan receipt in almost the exact terms of the one here involved, in the Par-X Uniform Service Corporation case, *supra,* at page 559 the court said:

"The proofs of loss and the checks indicate unequivocally that the plaintiff has been paid in full and is no longer interested in this action. The only evidence negating this conclusion are the loan agreements attached to the checks. It appears therefrom that the plaintiff acknowledges the sums received as loans without interest, repayable to the extent of any recovery herein. Such recovery is pledged to the insurers and plaintiff agrees to co-operate to that end and prosecute the action in its own name at the expense of the insurers and under their absolute control.

"On this record, I cannot but find that this is an empty device to avoid the necessity of the insurers suing in their own names as subrogees, and that the plaintiff is not the real party in interest but has assigned the cause of action and may not maintain it. . . .

"It follows that the defendant may have judgment dismissing the complaint on the merits."

The cases cited and relied upon by appellant are distinguishable and several of them have been distinguished in the cases previously herein cited from the facts of this record.

We conclude that The Fidelity and Casualty Company was not subrogated to the rights of plaintiff under the circumstances of this case; that said surety company fully paid the losses of plaintiff in discharge of its indebtedness, and

that plaintiff was not entitled to maintain this action in its own behalf or as a substituted party for the surety company. It follows that the trial court did not err in granting summary judgment on the pleadings.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.